```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
TEAM 125, INC.,                                              :
                                                             :
                                        Plaintiff,           :
                                                             :
                        -against-                            :
                                                             :
UNITED STATES AVIATION                                       :
UNDERWRITERS, INC.                                           :
                                                             :
                                        Defendant.           :
------------------------------------------------------------ X
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/2/22
```

20-CV-11025 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

For several years, Team 125, Inc. ("Team 125") leased airplanes pursuant to a Management Agreement with an entity controlled by business magnate Robert Kraft and used those airplanes to transport Kraft's football team, the New England Patriots (the "Patriots"). For reasons not at issue in this lawsuit, the aircraft owner and the Patriots cancelled their contracts with Team 125 in the summer of 2020. Separate from proceedings involving the aircraft owner, the Patriots, and Team 125 (that dispute is not at issue here), in an interesting twist, Team 125 sued United States Aviation Underwriters, Inc. ("USAU"), which insured the aircraft, for failing to renew the insurance policy. However much sympathy the Court may or may not have for Team 125, its legal theory for suing the insurance company is simply not viable. USAU has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, USAU's motion is GRANTED.

## BACKGROUND

In September 2017, Team 125 entered into an Aircraft Consulting and Management Agreement ("Management Agreement") with 2/25/94 LLC ("2/25") for the operation, maintenance, and storage of two Boeing 767 airplanes used by the Patriots. Pl. 56.1 Response

1

Stmt., Dkt. 74-1 ¶¶ 11, 16(a); Harrington Decl., Dkt. 66-4, Ex. D.  2/25 is the registered owner of the aircraft and is a Kraft-controlled entity.  Pl. 56.1 Response Stmt. ¶¶ 10–11.  Team 125 also entered into a private carriage agreement with the Patriots to provide the team air transportation.  *Id.* ¶ 17; Harrington Decl., Dkt. 66-5, Ex. E.  The Management Agreement and the private carriage agreement obligated Team 125 to maintain insurance on the aircraft.  *Id.* ¶¶ 16(b), 17(c).  Team 125 contracted with USAU for aircraft liability and hull physical damage insurance.  *Id.* ¶ 26.  Each policy was for one year.  The last insurance policy (the "Policy") Team 125 had was for the one-year term ending September 1, 2020; that Policy is at issue here.  *Id.* ¶ 5; *see also* Harrington Decl., Dkt. 66-1, Ex. A (the Policy).  Team 125 was the Named Insured on the Policy, while 2/25 and the Kraft Group LLC ("Kraft") were additional insureds.  Pl. 56.1 Response Stmt. ¶¶ 41–43.[1]

On May 6, 2020, USAU notified Team 125 that the Policy was due to expire on September 1 of that year and that USAU intended to contact Team 125's insurance broker to begin its determination regarding renewal.  *Id.* ¶ 45; Harrington Decl., Dkt. 66-14, Ex. N.  Discussions thereafter led to USAU sending a renewal proposal to Team 125's broker on August 4, 2020.  Pl. 56.1 Response Stmt. ¶¶ 53–55.  A few weeks later, on August 21, 2020, USAU received a broker of record ("BOR") letter on behalf of 2/25 informing USAU that Team 125 did not have 2/25's permission to pursue the new insurance policy and that 2/25 had decided to terminate its agreements with Team 125.  *Id.* ¶¶ 58(c), (f)(i)–(v); *see generally* Harrington Decl., Dkt. 66-26, Ex. Z ("BOR letter").[2]  2/25 had by then decided that it would transfer operation of

---

[1]    For purposes of this opinion, the Court refers to 2/25 and Kraft collectively as "2/25".

[2]    In Defendants' 56.1 Statement, this paragraph is incorrectly numbered 58(a) and contains incorrect sub-numbering, but the paragraph being cited is located immediately following ¶ 58(e).

the aircraft to Eastern Airlines, LLC, effective September 30, 2020. Pl. 56.1 Response Stmt. ¶¶ 58(d), 66. USAU forwarded a copy of the BOR letter to Team 125 the day after receiving it. *Id.* ¶ 64. After substantial back-and-forth, on August 27, 2020, USAU received two additional letters from 2/25: the first letter was a copy of a letter addressed to Team 125 that informed Team 125 that 2/25 would seek insurance on its own; and the second, addressed to USAU, informed it that Team 125 was not authorized to renew insurance coverage for the aircraft. *Id.* ¶ 77; *see generally* Harrington Decl., Dkts. 66-39–40, Exs. MM–NN. USAU promptly forwarded both letters to Team 125. Pl. 56.1 Response Stmt. ¶ 78. The next day, August 28, 2020, four days shy of the Policy's expiration date, USAU informed Team 125 that it would not accept a request to bind a renewal of the Policy. *Id.* ¶¶ 83, 85. USAU then agreed to insure the two aircraft via a ground risk-only policy with 2/25 being the named insured. *Id.* ¶¶ 95, 97; Harrington Decl., Dkt. 66-56, Ex. DDD. According to USAU, that policy was cancelled on November 1, 2020, and USAU did not insure the aircraft after operations were transferred to Eastern Airlines. Pl. 56.1 Response Stmt. ¶¶ 98–99, 103–104.

Team 125 brought this lawsuit on December 29, 2020. *See* Dkt. 1.[3] In its Amended Complaint, Team 125 asserts a single claim of breach of the implied covenant of good faith and fair dealing. Am. Compl., Dkt. 27 ¶¶ 25–29. After the completion of discovery, USAU moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. *See* Not. of Mot. Dkt. 62. Team 125 opposed the motion. *See generally* Pl. Opp., Dkt. 75.

---

[3] Team 125 is a Delaware corporation with its principal place of business in Illinois, and USAU is a New York corporation with its principal place of business in New York. Pl. 56.1 Response Stmt. ¶¶ 1–2. The Court has diversity jurisdiction.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). A party may not "rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). Summary judgment cannot be defeated by the presentation of "but a 'scintilla of evidence' supporting [plaintiff's] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

On a motion for summary judgment, courts "construe the facts in the light most favorable to the non-moving party and [] resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). A district court is not, however, under any "obligation to engage in an exhaustive search of the record" when considering a motion for summary judgment. *Jones v. Goord*, 435 F. Supp. 2d 221, 259 (S.D.N.Y. 2006) (citing *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470–71 (2d Cir. 2002)).

## II. New York Law Applies to Plaintiff's Claim

Because the Court has diversity jurisdiction over this case, the Court must apply New York's choice-of-law rules to determine which state's law applies to Team 125's claim. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494–97 (1941). USAU argues that under New York choice-of-law rules, New York law applies to this claim because there is no conflict between New York law and Illinois law with respect to claims for breach of the implied covenant of good faith and fair dealing. Def. Mem., Dkt. 63 at 11–15. Team 125 does not dispute that New York law governs but argues that Illinois law applies to the Policy; the Policy provides that, should the terms of the Policy fail to comply with the law of the state in which it is issued, its terms should be construed to comply with the law of that state (here, Illinois). Pl. Opp. at 20 (citing Def. Rule 56.1 Stmt., Dkt. 64 ¶ 5). Whether USAU breached the terms of the Policy is a contract construction issue that the Court addresses below; the Court agrees with the parties that New York law governs Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

## III. No Reasonable Factfinder Could Determine That USAU Breached Its Implied Duty of Good Faith and Fair Dealing

Under New York law, an obligation of good faith and fair dealing is implied in all contracts. *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) (citations omitted). To succeed on a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must offer evidence showing that it was deprived of benefits to which it had a reasonable expectation. *Twelve Sixty LLC v. Extreme Music Library Ltd.*, No. 17-CV-1479, 2020 WL 2749708, at *13 (S.D.N.Y. May 26, 2020). The covenant applies only where an implied promise is so interwoven into the contract "as to be necessary for effectuation of the purposes of the contract"; breach of the covenant requires a party to violate "an obligation that

5

may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (citation and internal quotation marks omitted). The plaintiff bears the burden of showing that the defendant violated such an obligation by showing that the defendant "act[ed] with some improper motive." *Wagner v. JP Morgan Chase Bank*, No. 06-CV-3126, 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (citation and internal quotation marks omitted). That showing requires "proof of 1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence." *T.P.K. Constr. Corp. v. S. Am. Ins. Co.*, 752 F. Supp. 105, 112 (S.D.N.Y. 1990) (citation omitted). "[T]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Thyroff*, 460 F.3d at 408. The covenant also does not apply to future dealings. *Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 494 (S.D.N.Y. 2004) (citation omitted).

### A. Policy Renewal Is Not *Per Se* A Future Dealing

USAU first argues that, because policy renewal is a future dealing, the implied covenant of good faith cannot apply to it. Def. Mem. at 15–17. While it is true that "future dealings" are not covered by the implied covenant of good faith, *see CDL Hotels USA, Inc.*, 322 F. Supp. 2d at 494, whether policy renewal constitutes a "future dealing" depends on the terms of the contract.

In New York, an affirmative policy renewal is, by definition, a new policy and a new contract. *Fidelity and Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 143 (2d Cir. 2008) ("New York law is clear that where an insurer has the absolute right to terminate a policy on its anniversary, each renewal does indeed represent a new policy.") (citation omitted). This stands in contrast to policies that contain provisions for automatic renewal; renewals of such

policies are extensions of existing contracts and maintain the same implied and express duties as the initial contract. *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89-CV-2809, 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (citations omitted).

The parties dispute whether the language in the Policy constituted, in effect, an automatic renewal provision. Pl. 56.1 Response Stmt. ¶¶ 30–31, 44, 93; Pl. Opp. at 21–22; Def. Mem. at 15-17; Def. Reply, Dkt. 76 at 4-5. There is no dispute that the Policy expressly required 60 days' notice that it would not be renewed. Ex. A, Endorsement 2 at 2.2. Even if no notice were given, however, the Policy provided that it would nonetheless end at its stated expiration date (September 1, 2020) if one of four conditions were met (with "you" referring to Team 125):

> 1. you fail to perform any of your obligations to pay a premium when it's due, whether this premium is due us, the Aviation Managers, your agent, or indirectly if you fail to pay a premium which has been financed; 2. we or the Aviation Managers have indicated we're willing [*sic*] to renew your policy to you or your representative; 3. you have notified us or the Aviation Managers or your agent that you do not wish to renew your policy; or 4. on the effective date of any other Coverage you acquire to replace this policy.

*Id.*

The Policy also provides that any terms "which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes." *Id.* at 27. Team 125 contends that means Illinois law governs the Policy and that, because USAU failed to give timely notice of its intent not to renew the Policy, by statute the Policy remained in effect past its stated expiration date. Pl. Opp. at 20 (citing 215 Ill. Comp. Stat. 5/143.17a).

There is no dispute that USAU first gave notice that it would not renew the Policy on August 28, 2020, Pl. 56.1 Response Stmt. ¶¶ 83, 85; Pl. Opp. at 22, and there is no dispute that none of the conditions that allow for non-renewal in the absence of advance notice occurred. Pl. Opp. at 22.

To the extent that there is a dispute over whether renewal of the Policy was, under the circumstances, automatic, the language of the Policy may create a triable question of fact, *CDL Hotels USA, Inc.*, 322 F. Supp. 2d at 494, such that a claim for breach of contract might have survived summary judgment. Indeed, Team 125 may be right that USAU's failure to comply with the notice provision resulted in the renewal of the Policy, either under the terms of the Policy or by operation of Illinois law — but the Court does not need to decide that issue.

Plaintiff sued only for breach of the implied covenant of good faith and fair dealing, and the covenant only applies to an implied promise that "is so interwoven into the contract" that compliance with it is necessary to effectuate the intent of the parties. *Thyroff*, 460 F.3d at 407. The Court agrees with USAU that the nonrenewal notice provision does not implicate the stated purpose of the Policy, which was to provide insurance coverage for two airplanes for one year. Ex. A at 2; Def. Reply at 8. Further, to succeed on this claim, Team 125 would have to show that it was deprived of bargained-for fruits as to which it had a reasonable expectation. *Twelve Sixty LLC*, 2020 WL 2749708, at *13. Team 125 certainly had a reasonable expectation that it would receive timely notice if USAU decided not to renew the Policy. But that is not the same as a reasonable expectation that the Policy would be renewed, especially in light of the pending termination of Team 125's relationship with 2/25, which became known to USAU only shortly before the Policy's expiration date. Team 125 also argues that it had, based on the terms of the Policy, a reasonable expectation that it would be able to fulfill its obligation under the Management Agreement to obtain insurance coverage. Pl. Opp. at 25. But that was, at best, an understanding about how it could have been damaged if the Policy were not renewed; the fruit of

8

the Policy as between USAU and Team 125 was insurance coverage.[4] The benefit of the Policy was the one-year term of coverage, and Team 125 was not deprived of that benefit.

In short, Plaintiff has not demonstrated that Defendant breached the implied covenant of good faith and fair dealing.

### B. Team 125 Cannot Prove That USAU Acted In Bad Faith

Assuming *arguendo* that Plaintiff could create a question of fact whether USAU breached the implied covenant of good faith and fair dealing, to survive summary judgment Team 125 must also provide sufficient evidence to create a question of fact that USAU's conduct was fraudulent, malicious, in bad faith, constituted intentional wrongdoing, or was recklessly indifferent to the rights of others. *T.P.K. Const. Corp.*, 752 F. Supp. at 112. Team 125 has not done so. *Wagner*, 2011 WL 856262, at *4 (collecting cases). Although Team 125 argues that it has demonstrated that USAU acted in bad faith or with an improper motive, Pl. Opp. at 22–25, its argument amounts to: USAU did not renew the Policy ergo USAU acted in bad faith. This kind of speculative, circular logic is not enough to create a triable question of fact.

The gist of Team 125's argument is that USAU's failure to renew the policy was motivated by its own desire to curry favor with another entity. Far from the direct threats that Team 125 alleged in its Amended Complaint, *see* Am. Compl. ¶ 28, Team 125's evidence of USAU's bad faith now consists of 18 actions, including: accepting a BOR letter from an additional insured contrary to industry norms;[5] relying on representations from 2/25 to determine

---

[4] As discussed *infra* at 12–13, Team 125 has failed to prove that USAU's conduct had a domino effect that led to 2/25 terminating its agreement with Plaintiff.

[5] Much of Team 125's support for its bad faith argument is based on the testimony and report of its expert, Rick Hammond, about standard industry practices with respect to insurance underwriting. Although many of Mr. Hammond's opinions, including that industry practice is to negotiate with the named insured and not with additional insureds, appear to be sound, much like Team 125's arguments, his opinions do not create a question of fact whether USAU acted in bad faith given the surrounding factual context present here. *See generally* Labat Decl., Exs. 6–7, Dkts. 75-4–5.

9

that the Management Agreement between 2/25 and Team 125 had been terminated; extending an insurance proposal to 2/25; neglecting to withdraw the renewal proposal that had been sent to Team 125; ignoring the notice provision of the Policy; finding that issuing an insurance policy to Team 125 would create duplicate coverage with the policy issued to 2/25; "inject[ing] itself into a contractual dispute" between 2/25 and Team 125; otherwise ignoring the rights of the policyholder; and maintaining a personal relationship with the additional insured's BOR. Pl. Opp. at 23–25. Leaving aside the repetitive nature of some of the actions Team 125 lists, nothing in the evidence proffered by Team 125 demonstrates that USAU acted on threats by non-parties, as alleged in the Amended Complaint, or that Team 125 made anything other than a business decision based on newly-available information. Def. Mem. at 18–20. Although Team 125 nominally contests USAU's assertions that it had no communications with other parties relating to whether it would renew the Policy, it provides no evidence to the contrary, much less evidence of threats or collusion. Pl. 56.1 Response Stmt. ¶¶ 105–110. In all, the correspondence to which Team 125 and its expert point as a smoking gun is relatively unremarkable. Labat Decl., Ex. 7, Dkt. 75-5 at 11–13.

  Team 125 argues with more specificity that two of USAU's actions were arbitrary: determining "unilaterally" that the Management Agreement had been terminated, based on a BOR letter that Team 125 suggests USAU should not have accepted as true; and refusing to renew coverage even though the Policy had been renewed for two prior years. Pl. Opp. at 23, 25. The first contention is easily contradicted both by the content of 2/25's letter to USAU and by USAU's decision to forward that letter immediately to Team 125, thereby giving it an opportunity to object. Pl. 56.1 Response Stmt. ¶ 64. The second relies entirely on Team 125's expert's opinion about industry standards with respect to notice. *See generally* Labat Decl., Ex.

7. While USAU may have breached the contract by failing to renew the Policy, regardless of industry norms, no reasonable trier of fact could find that the decision not to renew, which was informed in part by: a BOR letter stating that the owner of the aircraft had terminated the Management Agreement with Team 125, *see* Ex. Z, Dkt. 66-26; a letter from the owner of the aircraft stating unequivocally that Team 125 was not authorized to insure the aircraft, *see* Ex. NN, Dkt. 66-40; and concerns about duplicative coverage, was arbitrary. *See* Def. Mem. at 22–23. Although Team 125 argues that 2/25's representation that it had terminated its agreements with Team 125 should not have been accepted at face value and should have been irrelevant to USAU's underwriting decision, Pl. Opp. at 2, it was not unreasonable for USAU to consider this information and to treat it as credible, given its source. Further, USAU immediately forwarded the pertinent letters to Team 125, giving Team 125 an opportunity to respond. Pl. 56.1 Response Stmt. ¶¶ 64, 77(b), 78. Viewing all of the evidence in the light most favorable to Plaintiff, these facts just do not come anywhere close to proving that USAU acted in bad faith. *Wagner*, 2011 WL 856262, at *4. Particularly in light of the information provided to USAU shortly before expiration of the Policy, namely that the Management Agreement had been terminated, that the owner of the aircraft did not consent to renewal of the Policy, and that there was a legal dispute between 2/25 and Team 125, Plaintiff's argument that USAU acted with improper motive is a hill too steep for Team 125 to climb.

      Lacking any evidence of USAU's deliberate or reckless failure to consider Team 125's interests, there is no triable question of fact regarding USAU's motive for not renewing the policy. Without proof of this element, Team 125 cannot prove its sole claim.

### C. Team 125 Cannot Prove Damages

Finally, Team 125 has also failed to produce any evidence of damages. Team 125 alleged in the Amended Complaint that USAU's decision not to renew the Policy prevented it from obtaining insurance coverage required under the Management Agreement, resulting in Team 125's noncompliance with the Agreement. Am. Compl. ¶ 29. But the undisputed facts show that 2/25 had provided Team 125 with notice that it would terminate the Agreement on July 2, 2020, well before USAU gave notice of its intent not to renew. Pl. 56.1 Response Stmt. ¶¶ 19–20. There is no evidence that the looming Policy renewal *vel non* had any bearing on 2/25's decision. To the extent that the Management Agreement would have entitled Team 125 to a fee based on the cost of obtaining insurance, those damages would be pertinent in a claim against 2/25, not one against USAU. Def. Reply at 9.

Team 125 also argues that the lack of insurance grounded the aircraft, preventing Team 125 from earning fees pursuant to the Management Agreement. Pl. Opp. at 29. This argument only applies to the period between the end of the Policy — September 1, 2020 — and the effective termination date of the Management Agreement in October 2020. Team 125 argues that it incurred financial loss during that period because it was unable to fly the Patriots or third-parties due to its lack of insurance. *Id.* But Plaintiff has presented no evidence that the Patriots would have sought use of the planes during the relevant window had the airplanes been insured; as to third-parties, Team 125 provides no evidence of prospective contracts from which the Court can infer it suffered damages. Because Team 125 offers no evidence related to this theory of damages and asserts a value without putting forth any proof within the record other than an unsupported conclusory statement in an affidavit, *see* Francis Decl., Dkt. 74-2 ¶¶ 27–28; Def. Reply 56.1 Stmt., Dkt. 78 ¶¶ 141–42, the record contains no evidence tying USAU's choice not

to renew the Policy to damages suffered by Team 125 by virtue of being unable to fly either the Patriots or third-parties during that window.[6]

### IV. The Court Will Not Stay Its Decision

Team 125 asks the Court to stay its decision to allow it to gather additional facts in discovery pursuant to Federal Rule of Civil Procedure 56(d). Pl. Opp. at 30–33. At the end of the fact discovery period, *see* Letter, Dkt. 48, Team 125 also sought to extend discovery. *See* Order, Dkt. 51. Then, as now, Plaintiff provides no explanation why the allegedly critical discovery was not obtained during the discovery period set by the Court. Accordingly, the request to stay this decision and to reopen discovery is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate all open motions and close this case.

**SO ORDERED.**

Date: **February 2, 2022**
**New York, NY**

                                                 **VALERIE CAPRONI**
                                                 **United States District Judge**

---

[6] Additionally, because 2/25 is the registered owner of the aircraft, it is unclear the extent to which Team 125 would have been able to fly third parties even if it had contracts in hand. Even when the leases were in effect, Team 125 lacked the ability to contract with third parties without 2/25's permission. *See* Harrington Decl., Exs. B–C (Lease Agreements), Dkts. 66-2–3 at Section 2(b).

Team 125's final argument that it was damaged by USAU's breach of the implied covenant is absurd. Plaintiff argues that "since September 2020, [it] has sent requests for insurance quotes for aircraft insurance on other aircraft it owns or has control of. USAU has refused to even give a quote to Team 125. . . . USAU's retaliatory refusal to quote any insurance has placed Team 125 in a grave competitive disadvantage in the marketplace and seriously harming its business prospects. *See* S.D.F. ¶ 145." Pl. Opp. at 29–30. While USAU's cold shoulder may, in fact, have created difficulties for Plaintiff given the small number of insurance companies that insure aircraft, that is entirely unconnected — in law or logic — from any damages caused by USAU's alleged bad faith decision not to renew insurance on the aircraft Team 125 had leased from 2/25.